# IN THE COURT OF APPEALS OF IOWA

No. 23-0745
Filed August 21, 2024

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**JUSTIN MICHAEL LEE DYE,**
      Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Melissa Anderson-Seeber, Judge.

A criminal defendant appeals his conviction for sexual abuse in the second degree. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Benjamin Parrott, Assistant Attorney General, for appellee.

Considered by Ahlers, P.J., and Chicchelly and Buller, JJ.

**BULLER, Judge.**

Justin Dye appeals his conviction for sexually abusing six-year-old O.B. He challenges the admission of a recorded forensic interview, which was played for the jury after O.B. testified and could not recall material details of the offense. And he challenges the denial of his motion for new trial. We affirm, finding the recorded interview sufficiently trustworthy and discerning no abuse of discretion in the new-trial ruling.

## I.     Background Facts and Proceedings

Ericca Martinez met Dye in Idaho in 2018. Eventually Martinez and her five young children, including O.B., moved to Iowa and later into a trailer with Dye. At first, Martinez did not work and Dye was employed, so he had limited time alone with the kids. On one of Martinez's first days working outside the home, the children—including O.B.—were left at home in Dye's care. Soon after, O.B. reported Dye had sexually abused her.

Martinez called the police and took O.B. to the Allen Child Protection Center (CPC) to speak with a forensic interviewer. O.B., who entered the room carrying a stuffed leopard, was hesitant to speak with the interviewer and frequently said "I don't know" in response to questions. The interviewer and O.B. discussed the importance of telling the truth and not guessing when answering questions. Eventually O.B. disclosed that her "dad did gross stuff to [her]." O.B. said she was "scared" to tell the interviewer. She said the abuse happened while her mom was at work and she was alone in the bedroom with "daddy," which is what she called Dye (even though he was not her biological father). The interviewer asked a number of questions trying to discern what O.B. meant by "gross stuff," and O.B.

eventually explained that "daddy" touched her part that goes "pee." She said it happened "a lot of times" and that Dye told her not to tell people. The interviewer asked more follow-up questions and O.B. eventually said, "I saw his penis." The interviewer asked what Dye's penis looked like, and O.B. answered: "It was big." She also explained that Dye's "penis" was used for "peeing." After this interview, O.B. told a pediatric nurse practitioner that Dye's penis touched her vagina.

Three days later, O.B. was interviewed a second time at the CPC. This interview was generally consistent with the first, though it also included a few more details. O.B. described how Dye "did gross stuff to [her] peepee." She also described how her pants "fell" off. And she clarified that Dye touched her "peepee" with his "penis" and that his "private" was on her "private." She said again that it happened more than one time. And she repeated that Dye's penis was "big" and said his body "moved a little bit" during the abuse.

After O.B. was interviewed at the CPC, police interviewed Dye at the police station and told him he was under investigation for sexual abuse. The first explanation Dye gave was: "The only thing I can think of is while I was taking a crap and [O.B.] came into the bathroom to give me a hug." He claimed O.B. "climbed up on his lap" to give him a hug, and that his penis was "out while he was taking a shit." After the officer pushed back on this story, Dye said he also "tickled" O.B. "on the seam where the leg meets the hip," and he explained to the officer what he meant by gesturing near his crotch. Dye said he "suppose[d]" it was "possible" his hand touched her vagina. When the officer pressed Dye on whether there was any "penile contact," Dye added that he flipped O.B. "upside down," "bit her on the butt" through her shorts, and may have touched her breasts through

clothing while picking her up. When asked how his DNA might end up on O.B.'s vagina, Dye said it could be "oils from his fingers" left "when he went to tickle her." No suspect DNA profiles were ultimately developed from O.B.'s sexual-assault kit.

After waiting for DNA test results, police arrested Dye. The Black Hawk County Attorney charged him with one count of sexual abuse in the second degree, a class "B" felony in violation of Iowa Code section 709.3(1)(b) (2022). Before trial, Dye filed a motion seeking to exclude the recording of the CPC interview, and the court indicated it would preliminarily exclude the tape but revisit the issue after O.B. testified.

At trial, O.B. could not testify to material details of the abuse. While holding a stuffed owl, she told the jury she called Dye "dad" and said she was scared and knew why she was in court. She said she had to testify "because of Justin [Dye]," who "did inappropriate stuff." And she said she remembered Dye touching her but couldn't remember how it happened or any details. Following this testimony and over Dye's objection, the district court admitted the two recorded CPC interviews, and they were played for the jury in their entirety.

Dye testified in his own defense, as did his mother, father, and a friend. These three witnesses had all lived with Dye, Martinez, and the children for a period of time, and they all generally described O.B. as a difficult child who threw fits when she didn't get her way. Dye repeated versions of his bathroom and tickling stories at trial and said for the first time that he accidentally elbowed O.B. in the back of the head the same day she reported he sexually abused her. He claimed that he couldn't get up off the toilet to stop O.B. from touching him because he was in the midst of a bowel movement. He again denied the sexual abuse and

said "the closest thing" he did to touching O.B.'s vagina "was tickling in the pelvic" region.

The jury found Dye guilty as charged. He appeals.

## II. Discussion

Dye raises two issues: the admissibility of the CPC recordings and the district court's denial of his motion for new trial. On the first issue, the State partially contests error preservation. Because these claims involve different standards of review, we explore each in turn.

### A. The Recorded Interviews

The State first challenges whether Dye preserved what the State calls a "more technical argument" about the district court's alleged error in focusing on the interviewer's questioning instead of the victim's answers when assessing the interviews' trustworthiness. But on this particular record, we decline to parse the particulars and assume without deciding error was preserved on the full scope of Dye's appellate claim.

We review hearsay rulings for correction of errors at law. *State v. Skahill*, 966 N.W.2d 1, 8 (Iowa 2021). But "we give deference to the factual findings of the district court when the findings are supported by substantial evidence." *Id.*

The forensic interviewer who spoke with O.B. laid foundation for admitting the recordings at trial but did not comment in direct examination on the content of the interviews. The interviewer explained that she was trained through the national child advocacy center organization, had continuing education, and engaged in peer review of her work. She testified that the purpose of the CPC is that it's "neutral, it's child-friendly, it's family friendly," and it helps "limit the amount of times

that children are being talked to and being asked questions" to avoid re-traumatizing them. She explained that she generally asks open-ended questions and repeats the vocabulary used by the child to avoid introducing new information into the conversation.

Under longstanding case law interpreting our residual hearsay exception,[1] a recorded interview of a child is admissible if the State can show five elements: "trustworthiness, materiality, necessity, service of the interests of justice, and notice." *State v. Rojas*, 524 N.W.2d 659, 662–63 (Iowa 1994). This framework was recently re-affirmed by the supreme court. *See Skahill*, 966 N.W.2d at 10. In this appeal, Dye only challenges one element of the *Rojas* analysis: trustworthiness.

Our supreme court recently summarized the state of the law on trustworthiness in a case reversing exclusion of a recorded interview:

> With respect to trustworthiness, the relevant consideration is whether the proffered evidence has "circumstantial guarantees of trustworthiness." Iowa R. Evid. 5.807(a)(1) [2020]. We have previously considered the trustworthiness of recorded interviews and identified relevant considerations. In *Rojas*, we concluded the district court properly admitted a social worker's videotaped interview of a child sex abuse victim under the residual exception after the victim recanted her videotaped statements at trial. *See* 524 N.W.2d at 663–64. With respect to the trustworthiness of the evidence, we explained the recorded interview had sufficient guarantees of trustworthiness. *See id.* at 663. In particular, we noted the following: "[t]he interviewer asked [the child] open-ended, non-leading questions"; the questions "were not the kind that would prompt a child to fabricate the responses"; the child provided "a fairly detailed

---

[1] We recognize there is an independent statutory provision authorizing admission into evidence "the recorded statements of a child . . . describing sexual contact performed with or on the child, not otherwise admissible in evidence by statute or court rule if the court determines that the recorded statements substantially comport with the requirements for admission under rule of evidence 5.807." Iowa Code § 915.38(3). Neither party urges the statute materially affects our analysis.

account of the abuse itself"; the child remembered other details regarding the circumstances; the descriptions of the sex acts were "beyond the experience of the average ten-year-old"; the child's "statements were consistent throughout the interview"; and "the videotape [was] more reliable than many other forms of hearsay because the trier of fact could observe for itself how the questions were asked, what the declarant said, and the declarant's demeanor." *Id.* In contrast, in *State v. Cagley*, we held there was substantial evidence supporting the finding that a recorded interview was not sufficiently trustworthy where the alleged victim was older; "had sufficient time to fabricate her allegations"; "recanted, under oath, the statements at issue"; and "testified as to her motivation for doing so." 638 N.W.2d 678, 682 (Iowa 2001).

*State v. Veverka*, 938 N.W.2d 197, 203 (Iowa 2020). We have similarly explored the trustworthiness of CPC interviews in our published precedent, finding an interview trustworthy when it involved age-appropriate non-leading questions, the interview took place shortly after the abuse, and the videotape itself was played for the jury. *See State v. Neitzel*, 801 N.W.2d 612, 623 (Iowa Ct. App. 2011).

Here, the district court found the "CPC interviewer was not leading, asked open-ended questions, would loop back on something that the child said to further the conversation, [and] didn't find that the interviewer was suggesting answers based on [the court's] review of the interviews." We agree with this finding based on our own review of the interviews and note that the repetition or "looping" involved attempts by the interviewer to seek clarification regarding O.B.'s answers or her use of certain words like "private," "peepee," or "penis." *Cf. State v. Garcia*, No. 20-0227, 2021 WL 210744, at *2 (Iowa Ct. App. Jan. 21, 2021) (finding a CPC interview admissible in part because the interviewer "adopt[ed] the child's terminology such as 'private part' and 'butt'"). We disagree with Dye's characterization of the interviews as coercive. Like the district court, we do not find the interviews suggestive or leading. And we observe the interviews were

near in time to the abuse and elicited at least some details we would expect are beyond the ordinary understanding of a six-year-old. *See Veverka*, 938 N.W.2d at 203 (noting these are relevant facts); *Neitzel*, 801 N.W.2d at 623 (same). We find the *Veverka* and *Neitzel* considerations supported admission of the recordings.

As for Dye's claim the district court erred in focusing on the interviewer's questions rather than the child's statements, we find the district court's ruling is consistent with controlling case law. *See Veverka*, 938 N.W.2d at 203 (noting, among other considerations, the open-ended, non-leading questions asked by the interviewer and that the questions "were not the kind that would prompt a child to fabricate the responses" (citation omitted)); *Neitzel*, 801 N.W.2d at 623 (noting, among other considerations, the age-appropriate and non-leading questions asked by the interviewer).

We also find, in our review, that six-year-old O.B. provided a developmentally appropriate level of detail in her description of the abuse and used age-appropriate vocabulary to describe the subject even after she explained she was "really scared" to talk about it. Consistent with that observation, we recognize O.B.'s demeanor captured on video reflects her unease as the conversation moved into specifics of the sex acts, as compared to more neutral topics—which we find enhances, rather than detracts from, the trustworthiness of the evidence. *See Rojas*, 524 N.W.2d at 663 ("[A] videotape is more reliable than many other forms of hearsay because the trier of fact could observe for itself how the questions were asked, what the declarant said, and the declarant's demeanor.").

Last, Dye failed to develop a coherent or credible theory of improper motive or bias, which also favors finding the recordings trustworthy under our unpublished

cases. *See, e.g.*, *State v. Harrison*, No. 21–0784, 2023 WL 4105468, at *4 (Iowa Ct. App. May 10, 2023) ("And nothing suggests improper motive by either [the victim] or her mother."); *State v. Heggebo*, No. 17-1194, 2018 WL 6719729, at *4 (Iowa Ct. App. Dec. 19, 2018) ("[T]here was no evidence of improper motive on the daughter's part to make any statements."); *State v. Olds*, No. 14–0825, 2015 WL 6510298, at *8 (Iowa Ct. App. Oct. 28, 2015) ("We also note here there was no known reason for fabrication."). These considerations supporting trustworthiness were sufficient under our case law to authorize admission of the CPC recordings at Dye's trial, and the district court did not err when it admitted the recordings.

As a final point of interest on this issue, we observe that the amended rules of evidence, effective January 1, 2023, were in effect during Dye's trial. But Dye cited the old residual hearsay rule and case law. *Compare* Iowa R. Evid. 5.807(a)(1)–(4) (2022), *with* Iowa R. Evid. 5.807(a)(1)–(2) (2023). Dye continues to rely on this case law on appeal, despite noting the amendment.

As the leading Iowa treatise observes, the new (currently in effect) residual-hearsay rule expressly directs courts to "look at 'the totality of circumstances under which [the statement] was made.'" 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.807:1 (Oct. 2023 update) (quoting Iowa R. Evid. 5.807(a)(1) (2023 amendment)). Professor Emerita Doré further notes, "Trustworthiness depends on case-specific facts and 'indicia of trustworthiness' gleaned from prior precedent." *Id.* (citation omitted). We agree. In other words, both the new and old rule look at case-specific facts surrounding CPC interviews (or other statements), as developed through case law, in assessing trustworthiness. For

this reason, we are confident our analysis in this opinion would lead to the same outcome under both the new and old rule, rendering any confusion over Dye's challenge on that basis immaterial.

### B. Motion for New Trial

Dye also challenges the district court's denial of his motion for new trial. When evidence "preponderates heavily" against a verdict, the district court may grant a new trial to avoid a miscarriage of justice. *State v. Ellis*, 578 N.W.2d 655, 658–59 (Iowa 1998) (citation omitted). This standard requires the district court to "weigh the evidence and consider the credibility of witnesses." *Id.* at 658 (citation omitted). But on our review, we don't independently re-weigh evidence or judge a witness's credibility for ourselves—we review the district court's exercise of discretion, only reversing when a ruling rests on plainly untenable grounds or was clearly unreasonable. *State v. Reeves*, 670 N.W.2d 199, 202–03 (Iowa 2003).

In denying Dye's motion below, the district court found "the greater amount of credible evidence of this case does support this verdict. And so, therefore, regarding the weight of the evidence, . . . the verdict is not contrary to it based on the amount of credible evidence that was presented in this case." We discern no abuse of discretion.

The first sentence of Dye's substantive argument on this issue is: "There was no evidence to support O.B.'s claim of sexual abuse despite her being examined the day after she was reportedly abused." This assertion plays on rape myths by relying on the mistaken belief that sexual assault always leads to medical findings or physical injury to the victim's body. Here, a nurse practitioner from the

CPC explained to the jury that it is not unusual for there to be no medical findings of sexual assault, particularly given the abuse reported here—touching a penis to a vagina. And for fifty years, Iowa law has not required the testimony of a crime victim be corroborated, which negates the remainder of Dye's argument on this point. *See* 1974 Iowa Acts ch. 1271 (codified at Iowa Code § 782.4 (1975)) (repealing and replacing the corroboration requirement in sex offenses); *see also State v. Knox*, 536 N.W.2d 735, 742 (Iowa 1995) (en banc) ("The only direct evidence is the complainant's testimony. But under today's law that is sufficient to convict. The law has abandoned any notion that a rape victim's accusation must be corroborated."); Iowa R. Crim. P. 2.21(3) ("Corroboration of the testimony of victims shall not be required."). We find Dye's argument about lack of medical corroboration unpersuasive.

Dye also makes a more generalized credibility challenge, arguing O.B.'s statements are not credible because she was not forthcoming with the CPC interviewer or at trial and repeatedly said she "didn't remember." Dye contrasts this behavior with his own, which he describes as "cooperat[ing] with police by willingly giving a statement, providing his DNA sample, and turning over his phone for examination." We question whether this argument really asserts an abuse of discretion rather than impermissibly asking us to substitute our judgment for that of the district court. *See Reeves,* 670 N.W.2d at 202–03. In any event, we take a different view of Dye's shifting stories and implausible explanations for how he might have had contact with O.B.'s vagina. We discern no clearly erroneous, unreasonable, or untenable rationale in the district court's ruling.

**AFFIRMED.**